964 F.2d 1153
 140 L.R.R.M. (BNA) 2249, 296 U.S.App.D.C. 32,
121 Lab.Cas. P 10,167
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Northern California Newspaper Guild, Local 52, The Newspaper
Guild, AFL-CIO, CLC, Intervenor,
v.
McCLATCHY NEWSPAPERS, INC. PUBLISHER OF THE SACRAMENTO BEE,
Respondent.
 No. 90-1602.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 3, 1992.
Decided May 15, 1992.
As Amended June 17, 1992.
Rehearing and Rehearing En Banc
Denied July 23, 1992.
 
 Linda Dreeben, Supervisory Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., were on the brief, for petitioner.
 Allen W. Teagle, with whom John Skonberg, San Francisco, Cal., was on the brief, for respondent.
 James B. Coppess, with whom David Jonathan Cohen, Washington, D.C., and Marsha Berzon, San Francisco, Cal., were on the brief, for intervenor.
 Before EDWARDS, SILBERMAN & HENDERSON, Circuit Judges.
 Separate statements filed by Circuit Judge HARRY T. EDWARDS, Circuit Judge SILBERMAN and Circuit Judge KAREN LeCRAFT HENDERSON.
 ORDER
 PER CURIAM.
 
 
 1
 The National Labor Relations Board ("Board") petitions for enforcement of its decision in McClatchy Newspapers, Inc., 299 N.L.R.B. No. 156 (1990). A majority of the panel holds that the Board's justification for its finding that "the Respondent's failure to bargain with the Union about the timing and amount of merit increases constitutes a violation of Section 8(a)(5) and (1) of the [National Labor Relations] Act," id. at 7, does not constitute reasoned decisionmaking under past Board and court interpretations of the Act. Judge Silberman believes that the Board's explanation is inadequate under those precedents. We therefore deny the petition for enforcement. Judge Edwards and Judge Silberman agree that the case must be remanded to the Board for further consideration.
 
 
 2
 Set out below are statements of Judge Edwards and Judge Silberman, who separately concur in this order. Also set out below is a statement of Judge Henderson, who concurs in the denial of the petition for enforcement but dissents from the decision to remand the case to the Board.
 
 
 3
 So Ordered.
 
 HARRY T. EDWARDS, Circuit Judge:
 
 4
 The National Labor Relations Board ("NLRB" or "Board") petitions for enforcement of an order finding that McClatchy Newspapers, Inc. ("Newspaper" or the "employer") violated sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 158(a)(1), (5) (1988). In negotiations with the union representing a unit of its employees, McClatchy proposed a merit pay system that was designed to give the employer virtually complete, unilateral control of all employee salaries. Employer and union representatives bargained in good faith to impasse over the proposal; following impasse, the Newspaper implemented the proposal and awarded merit pay increases to selected employees. The Board found this to be a violation of the duty to bargain over individual wages.
 
 
 5
 The precise issue to be resolved in this case is whether, after bargaining in good faith to impasse, an employer may unilaterally implement a merit pay proposal and, pursuant thereto, change individual employees' wage rates without further notice to or bargaining with the union. While seemingly narrow in scope, this is a deceptively difficult question, reaching to the heart of labor law. And, although this particular question only recently has been raised, it occupies a space between several well-established doctrines of labor law. First, proposals covering wages (including systems of merit pay) are mandatory subjects of bargaining, with respect to which the parties must bargain in good faith in an effort to reach agreement. Second, even when a party is guilty of bad-faith bargaining, the Board may not compel either side to accede to a particular proposal. Third, following good-faith negotiations, the impasse rule applies and a party generally may take unilateral action with respect to a mandatory subject of bargaining over which impasse has been reached. Fourth, the Supreme Court has held that unilateral action may not be taken with respect to nonmandatory subjects of bargaining; furthermore, the Court has ruled that there are certain limited, categorical exceptions (covering the statutory right to strike, extension of arbitration beyond the term of an agreement, union security, and withdrawal from multiemployer bargaining) which are beyond the scope of the impasse rule.
 
 
 6
 In this case, the Board ignored the impasse rule; but, in finding the employer guilty of a refusal to bargain, the Board neither claimed to rely on any explicit statutorily-protected right, nor did it purport to hold that merit pay warranted status as a categorical exception to the impasse rule. Rather, the Board, in a wholly unconvincing opinion, rested on a badly misguided theory of "waiver," holding that the Newspaper was guilty of an unfair labor practice because it had acted without securing a necessary waiver of the union's right to bargain with regard to each individual employee's merit increase.
 
 
 7
 On the present record, I agree that we cannot enforce the Board's order. The result reached by the Board is arguably defensible; but it rests on a completely inadequate theory and fails to recognize the settled legal doctrines which bound this case.
 
 BACKGROUND
 
 8
 The essential facts in this case are undisputed and can be found in the NLRB's decision below, McClatchy Newspapers, Inc., 299 N.L.R.B. No. 156 (1990), reprinted in Joint Appendix ("J.A.") 311. The following brief summary is offered merely to put the case in focus.
 
 
 9
 McClatchy Newspapers, Inc. is the publisher of the Sacramento Bee, the largest daily and Sunday paper in Sacramento, California. Northern California Newspaper Guild, Local 52 (the "Guild"), represents several hundred editorial, advertising and telephone switchboard employees at the Bee. The parties have had a collective bargaining relationship for nearly 50 years, McClatchy Newspapers, CA No. 21429, at 2 (ALJ decision), J.A. 324 ("ALJ Decision "), and their most recent collective bargaining agreement, in effect from April 14, 1984, to April 13, 1986, provided for minimum salaries and step increases for each of several job classifications. The agreement also included a merit pay system for employees who had reached the top step of their classification and had worked at the Bee for more than one year. Although the Guild had the right to comment on the merit review and appeals process, the Newspaper retained ultimate discretion over the timing and amount of individual merit pay increases.[1] Additionally, while an employee could request union representation in an appeal over a merit pay decision, the Newspaper's judgments on merit increases were not subject to the collective bargaining agreement's grievance and arbitration provisions.
 
 
 10
 On February 13, 1986, two months before the extant collective bargaining agreement was to expire, the parties began negotiations with an eye toward a new contract. The initial wage proposals were diametrically opposed: the Guild requested a 25% wage increase, elimination of the merit pay system, and integration of cost-of-living adjustments into the step structure; the Newspaper proposed eliminating the guaranteed minimums and the step structure and sought to use merit increases exclusively, without notice to or participation by the Guild.
 
 
 11
 The parties quickly agreed that they should begin with noneconomic issues and return to economic issues later. After approximately 20 meetings, on November 11, 1986, the parties again took up the wage proposals. The Newspaper and Guild positions remained far apart, and in December the parties invited a federal mediator to participate in the stalemated negotiations. The parties continued to bargain in good faith in the presence of the mediator in January and February, but no agreement could be reached. At the February meeting, the Newspaper made a "last, best and final offer" that would have set guaranteed minimum wages at the current levels and would have "grandfathered" existing employees at the top step of the old wage structure. The Guild previously had rejected this proposal because only 10% of unit employees would be guaranteed salary increases, leaving substantially all salary adjustments within the employer's merit pay plan. As under the old merit pay program, the Guild would not have the right to comment on individual employees before their merit reviews were completed. Employees also could not grieve or arbitrate disagreements with the Newspaper's judgments on merit increases.
 
 
 12
 The union rejected the proposal and recommended to its membership that it vote against the Newspaper's offer. The membership did so. At the parties' last meeting on March 5, 1987, the Guild "made counterproposals, including a return to the combined negotiated wage and merit arrangement in the expired contract." McClatchy Newspapers, 299 N.L.R.B. No. 156, at 3, J.A. 313. The Newspaper countered with a proposal concerning unit exclusions. The parties reached a deadlock and negotiations were terminated. The next day, the Newspaper posted its merit plan and other terms and conditions consistent with its final offer. "Subsequently, the [Newspaper] granted merit pay increases to some unit employees without prior discussion with the Union." Id.
 
 
 13
 After individual merit increases were implemented without union consent, the Guild filed an unfair labor practice charge with the NLRB. The charge initially was dismissed, but the NLRB's National Appeals Office ordered it reinstated. Thereafter, an Administrative Law Judge found for the Guild and the Newspaper appealed to the Board. The Board also found for the Guild, but on substantially different grounds than the ALJ. The Board first concluded that the Newspaper, despite bargaining hard for discretion over wages, was not guilty of bad-faith negotiations. "[T]he evidence in this case is most consistent with the finding that the parties had engaged in in-depth, good-faith negotiations, and shared a contemporaneous understanding that they had reached an impasse in bargaining on the crucial issue of negotiated wages versus merit pay." Id. at 4, J.A. 314. The Board also held that "merit pay is a mandatory bargaining subject on which a party may lawfully insist to impasse." Id. at 5, J.A. 315.
 
 
 14
 Relying on its decision in Colorado-Ute Electric Association, 295 N.L.R.B. No. 67 (1989), enforcement denied, 939 F.2d 1392 (10th Cir.1991), petition for cert. filed, 60 U.S.L.W. 3582 (U.S. Feb. 25, 1992) (No. 91-1284), however, the Board held that the Newspaper committed an unfair labor practice by unilaterally granting individual merit pay increases, even though it had bargained to impasse with the Guild over the proposed plan which was designed to give the employer virtually unfettered control over merit pay. The Guild petitioned for review and the Board petitioned for enforcement. The Guild has since withdrawn its petition.
 
 
 15
 Courts of appeals review the Board's factual determinations for "substantial evidence." N.L.R.A. § 10(e), 29 U.S.C. § 160(e) (1988). Our review of the Board's judgment on questions of law is also well established:
 
 
 16
 Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute. NLRB v. Iron Workers, 434 U.S. 335, 350 [98 S.Ct. 651, 660, 54 L.Ed.2d 586] (1978). In the past we have refused enforcement of Board orders where they had "no reasonable basis in law," either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning. Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 166 [92 S.Ct. 383, 390, 30 L.Ed.2d 341] (1971). We have also parted company with the Board's interpretation where it was "fundamentally inconsistent with the structure of the Act" and an attempt to usurp "major policy decisions properly made by Congress." American Ship Building Co. v. NLRB, 380 U.S. 300, 318 [85 S.Ct. 955, 967, 13 L.Ed.2d 855] (1965).
 
 
 17
 Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); see also Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987) ("The Board, of course, is given considerable authority to interpret the provisions of the NLRA. If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts. Moreover, if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order.") (citations omitted); NLRB v. Financial Inst. Employees, Local 1182, 475 U.S. 192, 202, 106 S.Ct. 1007, 1013, 89 L.Ed.2d 151 (1986) ("Our cases have previously recognized the Board's broad authority to construe provisions of the Act, and have deferred to Board decisions that are not irrational or inconsistent with the Act.... [But,] [d]eference to the Board 'cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption ... of major policy decisions properly made by Congress.' ") (quoting American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).
 
 
 18
 On these facts, and with this standard of review in mind, I now turn to the issues presented.
 
 ANALYSIS
 I. Introduction
 
 19
 Because this case potentially implicates fundamental issues of labor law, and because it occupies a place between major labor doctrines, I believe the issues should be addressed comprehensively. I also do so because the Board's decision is totally lacking in its consideration of settled law. While this law arguably does not command a result opposite the Board's, it strongly implies one, and the Board has not yet adequately justified its reasoning.
 
 
 20
 Under the NLRA, the parties to a recognized or certified bargaining relationship have a duty to bargain over "mandatory" subjects--those aspects of the employment relationship falling within the statutory phrase "wages, hours, and terms and conditions of employment." In addition to mandatory subjects, the parties may mutually agree to bargain over and reach agreement on "permissive subjects," i.e., those matters which, although not within the compass of wages, hours or conditions of employment, are lawful subjects of bargaining. Merit pay proposals have long been considered mandatory subjects of bargaining, as indeed a plain reading of the term "wages" would indicate.
 
 
 21
 With regard to mandatory subjects, a union and an employer have a duty to bargain in good faith. Employers may not make unilateral changes in mandatory subjects of bargaining until they have satisfied their duty to negotiate. Nonetheless, because neither side is bound to reach an agreement, and the statutory scheme assumes that economic weapons will at times be used by both sides, the parties may bargain to impasse over mandatory subjects--including proposals that seek to win unilateral discretion for one side over a mandatory subject. Generally, once the parties reach a good-faith impasse, the duty to bargain is at least temporarily suspended, and the parties, typically the employer, may enact any change in a mandatory subject reasonably contained within its final proposal.
 
 
 22
 Here, the Board, despite the foregoing, held that McClatchy violated its duty to bargain when it unilaterally granted merit increases to some employees after reaching a good-faith impasse over a discretionary merit pay proposal. In so finding, the Board followed its decision in Colorado-Ute Electric Association, 295 N.L.R.B. No. 67 (1989), which the Tenth Circuit recently declined to enforce, Colorado-Ute Elec. Ass'n v. NLRB, 939 F.2d 1392 (10th Cir.1991), petition for cert. filed, 60 U.S.L.W. 3582 (U.S. Feb. 25, 1992) (No. 91-1284). The Board reasoned that the employer had violated its duty to bargain because it had failed to secure a necessary waiver of the union's right to bargain with regard to each individual employee's merit increase.
 
 
 23
 The articulated waiver rationale fails to justify the Board's result. Generally, the "waiver" cases to which the Board alludes address a substantially different facet of the employer/union relationship than the one here at issue; they most often arise during the pendency of a collective bargaining agreement and focus on whether a union has given its assent (or waived objections) to unilateral employer action. In these so-called "waiver" cases, the employer typically acts on a claim of contractual authority, or pursuant to asserted reserved rights, under the parties' existing collective bargaining agreement; thus, in such cases, the employer usually does not bargain before taking the specific action. By contrast, the Board here found that McClatchy bargained in good faith with the union over the merit pay proposal and that the parties had reached impasse. Furthermore, suggestions in the "waiver" cases that the employer may never take unilateral action without the union's consent do not apply here; that result derives from the effect of "zipper clauses" found within collective bargaining agreements. These clauses integrate all mandatory subjects of bargaining into the agreement and, when they are present, neither side can take unilateral action on a mandatory subject absent express or implied authority under the agreement, and neither side can force bargaining over any topic.
 
 
 24
 The Board's decision as presently justified is neither rational nor consistent with the Act. Nonetheless, I agree that we must remand this case for further proceedings because the Board might be able to justify the result reached in this case pursuant to an alternative legal and theoretical framework, i.e., a framework that admits of coherent treatment of established legal doctrine or that legitimately explains a departure therefrom.
 
 
 25
 For example, the Board might be able to classify the unilateral merit pay proposal here--where the employer retains the exclusive right to bargain with individual employees--as a permissive subject of bargaining. Or, the Board might follow up on its counsel's suggestion that, somehow, "merit pay is different," thus justifying treatment (like arbitration) as a categorical exception to the impasse rule. Or, the Board might attempt to justify a new category of subjects placed somewhere between "mandatory" and "permissive." The category might include those proposals by which one side seeks unfettered unilateral discretion over a mandatory subject of bargaining. The parties would be permitted to go to impasse over the proposal but would not be permitted to implement case-specific examples of the discretionary policy without at least prior notice to the other side.
 
 
 26
 It is unclear whether the Board will be able to justify the result in this case on any of the foregoing theories (or on any other theories not mentioned). As the Tenth Circuit noted in denying enforcement in Colorado-Ute, there is good reason to be skeptical of the Board's decisions in these cases: the Board's so-called waiver theory is a farcical misapplication of the law, and the Board thus far has failed to sort certain long-standing and heretofore predominant labor law doctrines that run counter to its position. Nonetheless, the Board's position is not unfathomable; to date, it is merely unjustified and only arguably unjustifiable. Therefore, it is appropriate that we withhold final judgment until after the Board has taken the opportunity to explore whether it can find a coherent niche within the fabric of established labor law for the result here urged. In this opinion, my mission will be to highlight the numerous analytical problems that will face the Board on remand.
 
 
 27
 II. The Duty To Bargain and the Right To Implement upon Impasse
 
 
 28
 Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5) (1988). Section 8(d) defines collective bargaining as
 
 
 29
 the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating such agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.
 
 29 U.S.C. § 158(d) (1988).[2]
 A. Mandatory Subjects of Bargaining
 
 30
 As evidenced by the plain language of section 8(d), the duty to bargain arises with regard to "wages, hours, and other terms and conditions of employment." "The duty is limited to those subjects, and within that area neither party is legally obligated to yield. As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree." NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958) (citation omitted) ("Borg-Warner "). Therefore, the first question in a duty to bargain case is whether the matter in dispute is a "mandatory subject of bargaining."
 
 
 31
 1. Mandatory Subjects in General and the Concern Over Direct Dealing.
 
 
 32
 Mandatory subjects generally are those which "regulate[ ] the labor relations between the employer and the employees." Borg-Warner, 356 U.S. at 350, 78 S.Ct. at 723. By contrast, matters that "deal[ ] only with relations between the employees and their unions" or "substantially modif[y] the collective-bargaining system provided for in the statute by weakening the independence of the 'representative' chosen by the employees," id., constitute permissive subjects that the employer may propose but may not insist upon, id. at 349, 78 S.Ct. at 722.
 
 
 33
 At the outset, it should be noted that a mandatory subject of bargaining does not lose status as such if one party seeks to gain complete control over the subject pursuant to collective bargaining. Thus, it is now well settled that proposals by which one side would retain discretion over a mandatory subject are also mandatory subjects. In NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 407-09, 72 S.Ct. 824, 831-32, 96 L.Ed. 1027 (1952), the Supreme Court held that the Board exceeded its authority by holding that "an employer could 'propose' such a [management discretion] clause [b]ut ... [could not] bargain[ ] for any such clause when the Union declines to accept the proposal." Id. at 408, 72 S.Ct. at 831. Rather, whether the subject will be committed to one party's discretion or set by definite terms should be decided by bargaining and the relative economic strength of the employer and union.
 
 
 34
 Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment is an issue for determination across the bargaining table, not by the Board.... Accordingly, we reject the Board's holding that bargaining for the management functions clause proposed by respondent was, per se, an unfair labor practice.
 
 
 35
 Id. at 409, 72 S.Ct. at 832.
 
 
 36
 This of course suggests that if merit pay is a mandatory subject of bargaining, then an employer may through collective bargaining attempt to gain discretionary control over its implementation. The issue raised in this case thus seems easy until one considers certain arguably countervailing legal doctrines under the NLRA.
 
 
 37
 A problem arises when an employer's proposal seems, on its face, to address "wages, hours, [or] other terms and conditions of employment," but the proposal includes direct dealing between the employer and individual employees or it otherwise seeks to evade lawfully prescribed arrangements in a recognized or certified bargaining relationship. In such situations, the proposal may constitute only a permissive subject. For example, in Borg-Warner, the employer insisted to impasse over proposals that would have required a secret employee vote on the employer's bargaining offer prior to a strike and that would have recognized an uncertified local affiliate as the employees' exclusive representative, instead of the International Union which the Board had certified. The Court found both to be permissive subjects: the first "enable[d] the employer, in effect, to deal with its employees rather than with their statutory representative," 356 U.S. at 350, 78 S.Ct. at 723; the second was "an evasion" of the duty to bargain with the employee's certified representative, id.
 
 
 38
 Recent cases echo these two concerns. Toledo Typographical Union No. 63 v. NLRB, 907 F.2d 1220 (D.C.Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991) ("Toledo Blade "), is an example of the first; there, the employer proposed to bargain with individual employees over retirement buyouts. The union refused and the parties bargained to impasse over the proposal. The court found that the employer had committed an unfair labor practice: the proposal was held to be a permissive subject because it involved direct dealing. "By allowing the Employer to bargain directly with its employees, Toledo Blade's proposal would deprive the Union pro tanto of its central statutory role." Id. at 1223.
 
 
 39
 Direct dealing between the employer and its employees cuts to the heart of collective bargaining and substantially weakens the union's role as collective representative of the workers. "The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). "The practice and philosophy of collective bargaining looks with suspicion on such individual advantages," the Court wrote in J.I. Case Co. v. NLRB, 321 U.S. 332, 338, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944).
 
 
 40
 [Individual contracts] are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long range expense of the group as a whole. Such discriminations not infrequently amount to unfair labor practices. The workman is free, if he values his own bargaining position more than that of the group, to vote against representation; but the majority rules, and if it collectivizes the employment bargain, individual advantages or favors will generally in practice go in as a contribution to the collective result.
 
 
 41
 Id. at 338-39, 64 S.Ct. at 580-81; see also Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944) ("Bargaining carried on by the employer directly with the employees, whether a minority or majority, ... would be subversive of the mode of collective bargaining which the statute has ordained.").
 
 
 42
 Evading the union's representative role--the second Borg-Warner concern--is illustrated by the courts' recurring attempts to distinguish between proposals "concern[ing] a change in work jurisdiction or a change in the scope of the bargaining unit." Local 666, Int'l Alliance of Theatrical Stage Employees v. NLRB, 904 F.2d 47, 48 (D.C.Cir.1990). In Local 666, the court distinguished between an employer's attempt to gain discretion over work jurisdiction--the description of tasks performed by unit members, a mandatory subject--and an attempt to gain discretion over the definition of the bargaining unit--a permissive subject because it affected which employees the union would represent. Id. at 50-52; see also Idaho Statesman v. NLRB, 836 F.2d 1396, 1400-01 (D.C.Cir.1988) ("If [definition of the bargaining unit] were a mandatory subject, an employer could use its bargaining power to restrict (or extend) the scope of union representation in derogation of employees' guaranteed right to representatives of their own choosing."); North Bay Dev. Disabilities Serv., Inc. v. NLRB, 905 F.2d 476, 478 (D.C.Cir.1990) (amount of agency fee was permissive subject because "the amount of an agency fee concerns primarily the relationship between the union and the non-member employees; it is not 'an aspect of the relationship between the employer and employees' "), cert. denied, --- U.S. ----, 111 S.Ct. 952, 112 L.Ed.2d 1041 (1991).
 
 
 43
 Thus, in light of the foregoing case law, it might be argued that the American National Insurance and Borg-Warner lines of authority are somewhat in tension, at least with respect to the proper treatment to be accorded a merit pay proposal of the sort here in issue. Nonetheless, at least to date, there has been little confusion in the case law over the definition of merit pay as a mandatory subject of bargaining.
 
 
 44
 2. Merit Pay is a Mandatory Subject of Bargaining
 
 
 45
 As the parties here concede, the Board and the courts long have held that "the obligation of the employer to bargain collectively with representatives of its employees with respect to wages, hours and working conditions, includes the duty to bargain with such representatives concerning individual merit wage increases." NLRB v. J.H. Allison & Co., 165 F.2d 766, 768 (6th Cir.), cert. denied, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948); see also, e.g., Colorado-Ute, 939 F.2d at 1400 ("It is well established that merit wages are encompassed within [the] statutory language and are a mandatory subject of bargaining."); NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1189 (D.C.Cir.1981) (merit pay is a mandatory subject); NLRB v. Johnson Mfg. Co., 458 F.2d 453, 454-55 (5th Cir.1972); NLRB v. United Brass Works, Inc., 287 F.2d 689, 697 (4th Cir.1961); NLRB v. Berkley Mach. Works, 189 F.2d 904, 907 (4th Cir.1951); General Controls Co., 88 N.L.R.B. 1341, 1342 (1950) ("It is now beyond dispute that an employer is under a duty to bargain with the representative of its employees with respect to individual merit increases.").
 
 
 46
 Additionally, it is largely undisputed that proposals for employer discretion over merit pay are mandatory subjects. In Cincinnati Newspaper Guild, Local 9 v. NLRB, 938 F.2d 284 (D.C.Cir.1991), the Board found no unfair labor practice where an employer insisted to impasse over a unilateral merit pay plan, a no-strike clause and a restricted grievance procedure which excluded arbitration. The court affirmed, distinguishing Toledo Blade, where, as described above, the court had found a proposal for direct employer-employee negotiations over retirement buyouts to be a permissive subject. Id. at 289.
 
 
 47
 Although the [employer] certainly sought a greater role for itself, and a lesser role for the Union, with respect to employee compensation and the resolution of day-to-day disputes, the Employer did not propose to strip the Union of its collective bargaining function. The [employer] was willing to negotiate with the Guild on the content of the merit pay plan, and to let the Guild represent any employee who wanted to challenge his proposed wage increase through the grievance procedure. These concessions would have preserved the Guild's role as the collective bargaining agent of its members, which is what distinguishes this case from Toledo Blade.
 
 
 48
 Id. at 290; see also Struthers Wells Corp. v. NLRB, 721 F.2d 465, 469-70 (3d Cir.1983) (no bad faith bargaining for employer to insist on discretion over merit pay, posting and bidding procedures, and work jurisdiction); NLRB v. Downs-Clark, Inc., 479 F.2d 546, 547-49 (5th Cir.1973) (employer insisted to impasse on discretion over merit pay). Furthermore, where the employer makes a unilateral decision about merit pay, without bargaining with the worker, it does not " 'intrude into the relationship between the employees and their Union' [and] interfere with the employees' right to bargain collectively." Cincinnati Newspaper Guild, 938 F.2d at 289 (quoting Toledo Blade, 907 F.2d at 1223).[3]
 
 
 49
 The merit pay proposal here shares many of the same features of the Cincinnati Newspaper Guild proposal. Although McClatchy was not constrained in its discretion to grant or deny merit pay, it "agree[d] to consider the Guild's comments, suggestions and recommendations about the merit evaluation and appeal processes." Posted Conditions of Employment, § 5.0(c), J.A. 287. Additionally, McClatchy agreed that "[i]f the employee requests, the Guild may participate with the employee in the appeal process." Id. § 5.0(e), J.A. 287. McClatchy's proposal thus was a mandatory subject of bargaining, and the Board does not suggest otherwise in its decision in this case.
 
 B. The Duty To Bargain in Good Faith
 
 50
 Because merit pay is a mandatory subject of bargaining, the parties were required to meet and in good faith try to reach an agreement. Neither side could take unilateral action with respect to the subject while bargaining continued. The employer and union were under no obligation to reach an agreement, however, and the Board was powerless to compel one.
 
 
 51
 1. Bargaining "in Good Faith" and the Unilateral Change Doctrine
 
 
 52
 "[P]erformance of the duty to bargain requires more than a willingness to enter upon a sterile discussion of union-management differences.... [Rather], an employer [must] 'negotiate in good faith with his employees' representative; to match their proposals, if unacceptable, with counter-proposals; and to make every reasonable effort to reach an agreement.' " NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952) (quoting Houde Eng'g Corp., 1 N.L.R.B. (old) 35 (1934)). In furtherance of this general goal, the Board and the courts have identified several "per se" violations of the duty to bargain, in addition to a "totality of the circumstances" approach to the duty. See generally Archibald Cox, The Duty To Bargain in Good Faith, 71 HARV.L.REV. 1401, 1421-28 (1958).
 
 
 53
 Generally, an employer commits a violation of the duty to bargain in good faith when it makes a unilateral change in a mandatory subject of bargaining during the course (or in the absence) of negotiations. Thus, where the employer granted merit pay increases during the course of negotiations, the Supreme Court held "that an employer's unilateral change in conditions of employment under negotiation is ... a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); see also, e.g., NLRB v. Cauthorne, 691 F.2d 1023, 1025 (D.C.Cir.1982) ("[A]n employer's implementation of a pre-impasse unilateral change in established wages or working conditions, over which bargaining is required, will constitute a violation of section 8(a)(5)."). Here, the Board found that McClatchy committed an unfair labor practice by unilaterally granting merit pay increases.[4]
 
 
 54
 A unilateral change not only violates the plain requirement that the parties bargain over "wages, hours, and other terms and conditions," but also injures the process of collective bargaining itself. "Such unilateral action minimizes the influence of organized bargaining. It interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent." May Dep't Stores Co. v. NLRB, 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145 (1945). Professor Cox highlighted the injury to the employees' right to be represented:
 
 
 55
 When taken during negotiations or upon subjects on which the union wishes to bargain it weakens the union by showing the employees that it is useless to try to negotiate. If the employer unilaterally raises wages or makes some other concession, his conduct effectively tells the employees that without collective bargaining they can secure advantages as great as, or possibly greater than, those the union can secure.
 
 
 56
 Cox, supra, at 1423. The unilateral change doctrine is thus applicable whether or not there is other evidence of bad faith bargaining.
 
 
 57
 Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance. It follows that the Board may hold such unilateral action to be an unfair labor practice in violation of § 8(a)(5), without also finding the employer guilty of over-all subjective bad faith.
 
 
 58
 Katz, 369 U.S. at 747, 82 S.Ct. at 1114.
 
 
 59
 The unilateral change doctrine is the basis for the related "past practices doctrine." Under the past practices rule, an employer and union who are bargaining without a collective bargaining agreement in effect generally must maintain the status quo with regard to mandatory subjects of bargaining. However, where the employer has had unilateral discretion over a mandatory subject, the employer cannot continue to exercise that discretion without prior notice to the union. For example, an employer may not continue granting discretionary merit pay raises, even if the review process has become customary and itself must be continued.An employer with a past history of a merit increase program neither may discontinue that program ... nor may he any longer continue to unilaterally exercise his discretion with respect to such increases, once an exclusive bargaining agent is selected. What is required is a maintenance of preexisting practices, i.e., the general outline of the program, however the implementation of that program (to the extent that discretion has existed in determining the amounts or timing of the increases), becomes a matter as to which the bargaining agent is entitled to be consulted.
 
 
 60
 Oneita Knitting Mills, 205 N.L.R.B. 500, 500 n. 1 (1973) (citation omitted); see also Litton Microwave Cooking Products v. NLRB, 949 F.2d 249, 252 (8th Cir.1991) (merit pay case following the Oneita Knitting Mills rule), cert. denied, --- U.S. ----, 112 S.Ct. 1669, 118 L.Ed.2d 390 (1992); NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1189 (D.C.Cir.1981) (Company could not discontinue annual reviews, but also "could not unilaterally determine the size of the increase that each employee would receive; it would be required to bargain over this discretionary element."). The Court in Katz explained that the employer may no longer exercise discretion because "[t]here simply is no way in such case for a union to know whether or not there has been a substantial departure from past practice." 369 U.S. at 746, 82 S.Ct. at 1113.
 
 
 61
 2. The Limit on the Duty To Bargain: Parties are not
 
 Required To Agree
 
 62
 As section 8(d) plainly states, the duty to bargain "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d) (1988). Congress added this language to the NLRA by the Taft-Hartley Act in "an attempt ... to prevent the Board from controlling the settling of the terms of collective bargaining agreements." NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 487, 80 S.Ct. 419, 426, 4 L.Ed.2d 454 (1960). The parties' relative economic strength--and not the Board's opinion--determines the substantive terms of the employer/union agreement. In short, while the Board, through judicial enforcement, can compel the parties to bargain, neither the Board nor the courts may use their authority to determine the results of that bargaining.
 
 
 63
 The NLRA was designed only to encourage meaningful discussion between employers and employee representatives. "The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement." H.K. Porter Co. v. NLRB, 397 U.S. 99, 103, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970); see also Cox, supra, at 1403-18 (discussing history of the Act). Equally clearly, however, Congress did not intend for the Board to impose substantive conditions. "[I]t was recognized from the beginning that agreement might in some cases be impossible, and it was never intended that the Government would in such cases step in, become a party to the negotiations and impose its own views of a desirable settlement." 397 U.S. at 103-04, 90 S.Ct. at 823-24.
 
 
 64
 In H.K. Porter Co., the Board found that the employer bargained in bad faith and it ordered, as relief, that the company agree to a union dues check-off proposal, which was one of the major contentions between the parties. The Supreme Court found that, even though there was no apparent good reason for the employer's rejection of the dues check-off proposal, the Board's attempted exercise of remedial authority fell outside the Board's powers under the Act.
 
 
 65
 [T]he Act ... does not contemplate that unions will always be secure and able to achieve agreement even when their economic position is weak, or that strikes and lockouts will never result from a bargaining impasse. It cannot be said that the Act forbids an employer or a union to rely ultimately on its economic strength to try to secure what it cannot obtain through bargaining.
 
 
 66
 397 U.S. at 109, 90 S.Ct. at 826; see also Insurance Agents', 361 U.S. at 489, 80 S.Ct. at 427 ("The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized.").
 
 
 67
 It is this balance between the duty to bargain and the power not to agree that caused the Court in American National Insurance Co. to conclude, as noted above, that proposals to retain discretion over mandatory subjects are themselves mandatory subjects. See 343 U.S. at 407-09, 72 S.Ct. at 831-32. This balance also means that the Board may not find a bad-faith refusal to agree solely by looking to the employer's bargaining position. "The Board now seems to have accepted the courts' repeated teaching that an employer's bargaining position is not itself bad faith but only evidence of bad faith, so that a finding of bad faith bargaining must be bolstered by additional evidence." Cincinnati Newspaper Guild, 938 F.2d at 289; cf. Sparks Nugget, Inc., 298 N.L.R.B. No. 69 (1990) (employer's insistence on unilateral discretion over seniority and wages was strong evidence of surface bargaining); Viking Connectors Co., 297 N.L.R.B. No. 15 (1989); Marina Assocs., 296 N.L.R.B. No. 147, at 1 n. 1 (1989) ("We disagree with the judge's statement that bad-faith bargaining may be determined solely by an employer's 'reservation to itself of unilateral control over merit increases.' ") (quoting Colorado-Ute Elec. Ass'n, 295 N.L.R.B. No. 67 (1989)).
 
 C. The Impasse Doctrine
 
 68
 Because the NLRA compels negotiation, but not agreement, the parties occasionally will reach an impasse in negotiations. Typically, when a good-faith impasse is reached, the duty to bargain further is temporarily satisfied and suspended, and either side is free to make unilateral changes in mandatory subjects that are reasonably comprehended within their proposals at the bargaining table. A party may insist to impasse on any mandatory subject, including proposals to retain discretion over a mandatory subject. Therefore, under established labor law, McClatchy would have the right to insist to impasse on its merit pay proposal and to implement it after reaching an impasse in good faith.
 
 
 69
 This court has defined impasse as "the deadlock reached by bargaining parties 'after good-faith negotiations have exhausted the prospects of concluding an agreement.' " Teamsters Local Union No. 175 v. NLRB, 788 F.2d 27, 30 (D.C.Cir.1986) (quoting Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967), petition for review denied sub nom. American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622 (D.C.Cir.1968)). In Taft Broadcasting, the Board identified the primary factors that would determine whether the parties had reached impasse.
 
 
 70
 Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of the negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed.
 
 163 N.L.R.B. at 478.[5]
 
 71
 A good-faith impasse in negotiations temporarily suspends the duty to bargain. The parties, however, are not permanently relieved of the duty to deal with each other. In Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), the Supreme Court summarized the prevailing view of the effect an impasse has on the bargaining relationship.As a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations "which in almost all cases is eventually broken, through either a change of mind or the application of economic force." [ Charles D. Bonanno Linen Serv., Inc., 243 N.L.R.B. 1093, 1093-94 (1979).] Furthermore, an impasse may be "brought about intentionally by one or both parties as a device to further, rather than destroy, the bargaining process." Id., at 1094. Hence, "there is little warrant for regarding an impasse as a rupture of the bargaining relation which leaves the parties free to go their own ways." Ibid.
 
 
 72
 Id. at 412; see also Hi-Way Billboards, Inc., 206 N.L.R.B. 22, 23 (1973) ("When such a deadlock is reached between the parties, the duty to bargain about the subject matter of the impasse merely becomes dormant until changed circumstances indicate that an agreement may be possible.").
 
 
 73
 As indicated above, see note 4 supra, the unilateral change doctrine generally applies only to changes made before fulfilling the duty to bargain--in other words, before the parties bargain to impasse. "[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change in an existing term or condition of employment." Litton Fin. Printing Div. v. NLRB, --- U.S. ----, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991); see also, e.g., Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 543 n. 5, 108 S.Ct. 830, 833 n. 5, 98 L.Ed.2d 936 (1988) (at impasse "the employer's statutory duty to maintain the status quo during postcontract negotiations would end"); NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 224, 69 S.Ct. 960, 963, 93 L.Ed. 1320 (1949) (no unfair labor practice where there is "a unilateral grant of an increase in pay made by an employer after the same proposal has been made ... in the course of collective bargaining but has been left unaccepted or even rejected") (dicta); Teamsters Local Union No. 639 v. NLRB, 924 F.2d 1078, 1084 (D.C.Cir.1991) ("In the absence of a bargaining impasse, an employer violates section 8(a)(5) ... by refusing to bargain.... An employer also violates its bargaining obligation ... if, without having negotiated to impasse, it unilaterally changes its employees' terms or conditions of employment.") (internal quotation omitted).
 
 
 74
 Thus, an employer may unilaterally implement its proposals upon impasse in negotiations. "After bargaining to impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 624 (D.C.Cir.1968) (emphasis added); see also Emhart Indus. v. NLRB, 907 F.2d 372, 377 (2d Cir.1990); Lapham-Hickey Steel Corp. v. NLRB, 904 F.2d 1180, 1185 (7th Cir.1990); Southwest Forest Indus., Inc. v. NLRB, 841 F.2d 270, 273 (9th Cir.1988); United Steelworkers v. Fort Pitt Steel Casting Div., 635 F.2d 1071, 1078 (3d Cir.1980), cert. denied, 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 843 (1981); Omaha Typographical Union, No. 190 v. NLRB, 545 F.2d 1138, 1142 n. 4 (8th Cir.1976).
 
 
 75
 Although these doctrines do not conclusively hold that an employer may insist to impasse over a discretionary wage proposal, the foregoing strongly suggests that McClatchy would have the right to implement its merit pay proposal upon impasse. Merit pay is a mandatory subject of bargaining. Employers may insist to impasse over mandatory subjects, even over those proposals which would garner them discretion over mandatory subjects. "[A]n employer's adamant insistence on promanagement terms does not alone demonstrate bad faith, and ... neither side is required to agree to a proposal or make concessions." NLRB v. Cauthorne, 691 F.2d 1023, 1026 n. 5 (D.C.Cir.1982) (citation omitted). The Board found, and the parties do not now dispute, that McClatchy and the Guild bargained to a good-faith impasse over the merit pay program. Finally, after impasse, an employer may implement its final proposal. Thus, as the Tenth Circuit suggested in Colorado-Ute, it is difficult to comprehend the Board's judgment in this case.
 
 
 76
 III. The Board's Limit on McClatchy's Ability To Implement its Merit Pay Program
 
 
 77
 In its opinion, the Board suggested two possible rationales for departing from the established analytical framework and holding that McClatchy violated section 8(a)(5). Neither supports the Board's result. First, the Board suggested that the individual merit pay increases granted by McClatchy were not "encompassed" within its bargaining proposal. But it makes no sense to say that an employer does not act within a proposal that would allow it unilaterally to determine each employee's merit raise when it unilaterally grants such a raise to a single employee. Second, the Board held that McClatchy sought a de facto "waiver" of the union's right to bargain over employees' wages and, failing to secure one, unjustly acted in derogation of that right. The waiver cases, however, are clearly inapposite where, as here, no collective bargaining agreement is currently in effect, the employer makes a permissible proposal on a mandatory subject and the parties bargain to impasse over that proposal.
 
 
 78
 A. Are Individual Wage Raises Comprehended Within a General, Discretionary Proposal?
 
 
 79
 The Board reasoned that McClatchy's proposal gave the Union no opportunity to bargain over the mandatory subjects of timing and individual amounts of merit pay. "[McClatchy's proposal] set no criteria for the amounts or timing of merit increases, and failed to provide for union participation either in the initial determination of merit increases granted to particular employees or afterwards through the contractual grievance procedure." McClatchy Newspapers, 299 N.L.R.B. No. 156, at 6, J.A. 316; see also id. at 7, J.A. 317 ("the Respondent had a lawful right after impasse unilaterally to consider employees for merit increases; however, as announced in Colorado-Ute, ..., it still had a duty to bargain with the Union about the timing and amounts of the merit increases prior to granting any such increases").
 
 
 80
 The Board's reasoning is far from persuasive. First, as the Tenth Circuit said, "Precedent does not support the Board's position that the Union's right to bargain can be vindicated only by discussing the economic terms of particular merit increases, rather than a general proposal that the employer be permitted to exercise discretion with respect to merit wage programs." Colorado-Ute, 939 F.2d at 1401. The Court in American National Insurance said directly that whether a matter is treated by definite terms or by a "more flexible" system is a matter for bargaining and, if necessary, economic pressure. 343 U.S. at 407-09, 72 S.Ct. at 831-32.
 
 
 81
 Second, the Board cannot plausibly contend that an individual's merit raise is not comprehended within the employer's proposal to have discretion over all employees' raises. "A company that has so exhausted bargaining that it may make a unilateral change is not to be put under a universal requirement of a duty to bargain about timing or other specific aspects of a change that is within the ambit of proposals already made and rejected." American Fed'n of Television & Radio Artists, 395 F.2d at 629. Implementing the proposal necessarily includes granting individual wage increases. Indeed, the Board's suggestion to the contrary is patently absurd. The Board's attempted distinction--that the employer upon impasse "was free to consider employees for merit increases" but not to grant them--fails because the employer gains nothing upon impasse that it did not have before the commencement of bargaining. An employer commits no violation of the duty to bargain merely by "considering" changes in mandatory subjects of bargaining.
 
 B. The Board's "Waiver" Theory
 
 82
 The Board also contends that permitting the employer to enact its merit pay proposal works a de facto "waiver" of the union's right to bargain over merit pay.The Union did not agree to the Respondent's merit pay proposal and, in fact, expressed its opposition to it for the very reason that it would completely exclude the Union's participation in determining merit pay increases. The Respondent was unable during negotiations to secure the Union's waiver of its right to bargain over the timing and amounts of merit pay increases. Nor does the parties' bargaining history establish a waiver. Consequently, the Respondent was free to insist to impasse that the Union agree to waive its statutory rights, but was not privileged to proceed with implementation after impasse as though it had successfully secured the Union's waiver.
 
 
 83
 299 N.L.R.B. No. 156, at 6-7, J.A. 316-17 (footnote omitted); see also id. at 6, J.A. 316 ("Thus [according to the Board], the proposal, by providing for unlimited management discretion over the determination of timing and amounts of merit increases, was in reality seeking the Union's waiver of its statutory right to be consulted over those matters under Section 8(a)(5) and (1) of the Act.").[6]
 
 
 84
 Established waiver doctrine, however, is directed to a substantially different problem. In waiver cases, the employer takes some unilateral action with respect to a mandatory subject and claims that the union had already agreed to the employer's right to take that action. For example, in the leading waiver case, Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the company disciplined union leaders who violated the collective bargaining agreement's no-strike clause more severely than "regular" employees who also had walked out. Defending against a charge of anti-union discrimination in violation of section 8(a)(3), the employer asserted that, by acquiescing in two arbitration decisions interpreting the no-strike provision of the contract, "the union in effect ha[d] waived the protection afforded by the statute." Id. at 705, 103 S.Ct. at 1475; see also, e.g., NLRB v. United Techs. Corp., 884 F.2d 1569, 1574-75 (2d Cir.1989) (employer initiated new disciplinary system and claimed that union had waived its right to bargain over it); Local Union 1395, IBEW v. NLRB, 797 F.2d 1027, 1028-29 (D.C.Cir.1986) (employer disciplined employee for honoring picket line at a work site; employer claimed that collective bargaining agreement's no-strike clause constituted waiver of right to honor picket lines); ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW 469 (1976) ("The vast preponderance of cases applying the 'clear and unmistakable waiver' principle ... involve a charge that the employer unilaterally announced or implemented a change in the status quo without giving notice or an opportunity to bargain to the union.... The employer typically asserted as a defense that the union had authorized the employer so to act, most commonly by agreeing to a management rights clause, a zipper or integration clause, a grievance and arbitration procedure, ..., or some unwritten concession in the course of bargaining.").
 
 
 85
 The factual circumstances of this case could not be more different. Here, McClatchy offered the Guild the opportunity to bargain over its wage plan, and the Board found that the parties negotiated in good faith to impasse over the proposal. The Newspaper does not claim that the union agreed to waive its right to negotiate over the merit pay proposal or over individual merit pay raises. Rather, the Newspaper claims that, by negotiating to impasse, it satisfied its duty to bargain and therefore could proceed with its proposal under the impasse rule.
 
 
 86
 The Board, however, asserts that the waiver cases establish that "[i]n the absence of such a waiver, the employer's obligation--as in other situations involving statutory rights--is to comply with the statute." Brief of the NLRB at 25-26. In the Colorado-Ute decision, the Board directly states that a bargaining impasse is "no substitute for consent"--the employer cannot take the action unless the union agrees. See 295 N.L.R.B. No. 67, at 8. But the Board is comparing apples and oranges. In none of the cases the Board cites did the employer attempt to bargain about the change before enacting it. See NLRB v. Challenge-Cook Bros., 843 F.2d 230, 232-34 (6th Cir.1988); Ciba-Geigy Pharms. Div. v. NLRB, 722 F.2d 1120, 1127 (3d Cir.1983); NLRB v. Southern Calif. Edison Co., 646 F.2d 1352, 1364-69 (9th Cir.1981). The Board has attempted to take the words from decisions involving claims of "waiver" in situations where an agreement exists and apply them to cases where the parties are bargaining to secure an agreement; it does not work because, in the latter situation, the impasse rule comes into play (thus making "waiver" irrelevant).
 
 
 87
 Thus, the words from some of the "waiver" cases, saying that union consent is necessary before the employer may take action, are irrelevant in cases that implicate the impasse rule. For example, where the parties have a presently effective, integrated collective bargaining agreement that includes a "zipper" clause, the parties may take only those actions specifically detailed in the collective bargaining agreement. "During the term of a contract ... the scope of the duty to bargain over a particular mandatory subject depends upon whether that subject is 'contained in' the contract." International Union, UAW v. NLRB, 765 F.2d 175, 179 (D.C.Cir.1985) ("Milwaukee Spring"). Where the contract is zippered, it necessarily covers all the mandatory subjects of bargaining and the employer is forbidden to take any action not "contained in" the contract without the union's consent. By the interaction of the zipper clause and section 8(d)'s prohibition on midterm changes in subjects agreed upon, neither party can take any action not contained in the contract and neither party can force the other side to bargain over any subject not contained in the contract. Thus, consent, not bargaining to impasse, is required to affect a mandatory subject. The Milwaukee Spring court explicitly laid out this result.
 
 
 88
 Thus, it is well understood that section 8(d) prohibits an employer from altering contractual terms concerning mandatory subjects of bargaining during the life of a collective bargaining agreement without the consent of the union.
 
 
 89
 A mandatory subject of bargaining may be brought into the "contained in" category, and therefore within the provisions of section 8(d), either through explicit reference, such as a wage provision, or through a general waiver of the duty to bargain, such as a zipper clause. Generally speaking, a zipper clause has the effect of incorporating all possible topics of bargaining--both those actually discussed and those neither discussed nor contemplated during bargaining--into the contract. As a result, with the inclusion of a zipper clause, section 8(d)'s "contained in" requirements are brought into play with regard to all mandatory subjects of bargaining; neither party may require the other to bargain over any mandatory subject, nor unilaterally implement a change in the status quo concerning a mandatory subject, even after bargaining to impasse.
 
 
 90
 Id. at 180 (footnotes omitted). Thus, consent is necessary only because section 8(d) prevents any nonconsensual changes in mandatory subjects "contained in" the contract and the zipper clause integrates all mandatory subjects into the contract.
 
 
 91
 Similarly, in "waiver" cases where the statutory right involves a specific protected union activity, consent will be necessary. For example, in Local Union 1395, IBEW v. NLRB, 797 F.2d 1027 (D.C.Cir.1986), the employer, a power company, disciplined an employee who honored a picket line at a work site. "Under Section 7 of the Act, 29 U.S.C. § 157 (1982), employees enjoy the right to observe lawful picket lines that they encounter in the course of their duties." Id. at 1029. The company argued, and the Board found, that the union had waived its rights by agreeing to a broad, general no-strike clause. The court disagreed and held that company could not institute the discipline without the union's consent--bargaining to impasse would not suffice.
 
 
 92
 In the proceeding below, Local 1395 introduced evidence that when the contract was negotiated the parties had asserted different interpretations of the no-strike clause and that neither party had acquiesced in the other's view. The ALJ concluded that the parties had agreed to disagree over whether sympathy strikes were covered by the clause. If accepted, this factual finding would be controlling: absent mutual consent on the issue, there could be no binding contractual commitment, and, a fortiori, no clear and unmistakable waiver of the right to honor picket lines.
 
 
 93
 Id. at 1036 (citation omitted). This result is explained by the shape of the right at issue. Section 7 protects workers' right to respect lawful picket lines and the employer may not violate that right without a waiver. Section 8(a)(5), by contrast, protects only the workers' right to have the employer bargain with the union over wages. As the Court held in American National Insurance Co., the section does not give the workers the right to have a definite, standard-based wage system as opposed to a discretionary employer-conducted system. Rather, the workers must bargain for that right, including using their economic weapons. Thus, as noted above, once the employer has bargained to impasse over its proposal, it has satisfied the statute.
 
 
 94
 In sum, the waiver rationale fails. McClatchy satisfied its duty to bargain over the wage system for unit employees and the union has no right to insist upon a proposal for definite terms. Thus, from the perspective of general impasse doctrine, the Board's reasoning fails. The merit pay proposal was a subject over which the employer could insist to impasse; and employers generally may unilaterally implement those proposals offered and rejected.
 
 
 95
 IV. Alternate Paths to the Board's Result?
 
 
 96
 Although we believe it has failed adequately to justify its result in this case, the Board considers the issues in this case to be fundamental. I cannot disagree. However, "[b]ecause the Board misconstrued the bounds of the law, its opinion stands on a faulty legal premise and without adequate rationale ... [thus,] we remand this case ... so that the Board may reconsider" its decision. Prill v. NLRB, 755 F.2d 941, 942 (D.C.Cir.), cert. denied, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985). Nonetheless, I review some of the implications of the above discussion for the light it may throw on the Board's future attempts in this area.
 
 
 97
 A. Merit Pay Proposals as Permissive Subjects
 
 
 98
 In his decision, the ALJ expressed concern that McClatchy's proposal constituted impermissible direct dealing. ALJ Decision at 8, J.A. 330. As noted previously, the specter of direct dealing between employers and employees often prompts the Board to declare a particular proposal a permissive subject. See section II.A.1 supra. Employers may offer these proposals, but may not insist on them to impasse. Although the Board in this case did not rely on this rationale, certain aspects of the Newspaper's proposal arguably suggest direct dealing and, therefore, the proposal might be permissive.
 
 
 99
 Of course, it is settled law of the circuit that discretionary merit pay proposals are not per se permissive subjects. See section II.A.2 supra. Nonetheless, McClatchy's final proposal also permitted employees to deal directly with the newspaper. See Posted Conditions of Employment, § 3.9, J.A. 286 ("Nothing in this Agreement shall prevent employees from bargaining individually for salary increases in excess of the minimums established herein."). Additionally, the Union here can represent an employee in his appeal of a merit pay raise only if the employee requests. Id. § 5.0(e), J.A. 287. Direct dealing with the employee requires the union's consent; as the Court held in J.I. Case, all employees are bound by the majority's decision to bargain collectively. 321 U.S. at 339, 64 S.Ct. at 581.[7]
 
 
 100
 Whether or not these aspects of McClatchy's proposal create direct dealing in fact would be a matter for the Board in the first instance.[8] But, were the Board to find a given merit pay proposal to implicate direct dealing to the extent necessary to make it a permissive subject, then the employer would not be free to insist on it to impasse. Of course, the Board must, in the first instance, consider this and related questions, see note 8 supra, on remand.
 
 B. Merit Pay as a "Different" Issue
 
 101
 At oral argument, counsel for the Board suggested that merit pay was unique in some way that justified the Board's result in this case. While the notion that "wages" may be the heart of all the terms of employment has intuitive appeal, I confess that I am not certain of the scope of this potential argument. Still, the Board is the primary force for balancing the sometimes conflicting policies behind the NLRA. The Board, in exercise of its charge to further the collective bargaining process, may be able to demonstrate that unilateral employer discretion over wages uniquely injures peaceful bargaining and labor relations.
 
 C. Modification of the Impasse Rule
 
 102
 Finally, the Board may wish to consider fashioning a limited exception to the impasse rule. In effect, the Board might create a new category of bargaining subjects which would include those proposals by which the employer seeks to grab discretion. Consistent with American National Insurance Co., the employer could go to impasse over these proposals--denying the union a contract unless it acquiesced--but the employer could not implement specific examples of the proposal (for example, grant individual merit pay raises) without further notice to the union.
 
 
 103
 The right to implement upon impasse (i.e., the impasse rule) is not a right guaranteed by statute, but rather grows out of the particular scheme of industrial relations created by the National Labor Relations Act. As described previously, the Act encourages collective bargaining while preserving most of the economic weapons each side has to force the other to agree. The unilateral change rule recognized in Katz, from which the impasse rule derives, protects the employees' collective bargaining right while simultaneously reserving to employers the right to manage their enterprises so long as they bargain in good faith with the employees' representative.
 
 
 104
 Nonetheless, although the impasse rule in general balances these competing impulses, it need not apply to every category of cases. For example, in Charles D. Bonanno Linen Service, the Court upheld the Board's determination that an impasse in negotiations would not justify a single employer's withdrawal from a multiemployer bargaining unit, even if that employer were the target of a whip-saw strike by the union. The Court deferred to the Board's view that permitting withdrawal, absent extraordinary circumstances, would damage the process of multiemployer collective bargaining.
 
 
 105
 Of course, the ground rules for multiemployer bargaining have not come into being overnight. They have evolved and are still evolving, as the Board, employing its expertise in the light of experience, has sought to balance the "conflicting legitimate interests" in pursuit of the "national policy of promoting labor peace through strengthened collective bargaining." [NLRB v. Truck Drivers, 353 U.S. 87, 95, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957) (Buffalo Linen).] The Board might have struck a different balance from the one it has, and it may be that some or all of us would prefer that it had done so. But assessing the significance of impasse and the dynamics of collective bargaining is precisely the kind of judgment that Buffalo Linen ruled should be left to the Board.
 
 
 106
 454 U.S. at 413, 102 S.Ct. at 413.
 
 
 107
 Similarly, in its recent decision in Litton Financial Printing Div. v. NLRB, --- U.S. ----, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), the Supreme Court deferred to the Board's determination that arbitration provisions did not survive the expiration of a collective bargaining agreement and, therefore, they cannot be imposed unilaterally even after the parties have bargained in good faith to impasse. Thus, arbitration, as well as union security and dues check-off provisions, can be implemented only by mutual consent of the parties to a bargaining relationship.
 
 
 108
 The Board has identified some terms and conditions of employment ... which do not survive expiration of an agreement for the purposes of this statutory policy. For instance, it is the Board's view that union security and dues check-off provisions are excluded from the unilateral change doctrine because of statutory provisions which permit these obligations only when specified by the express terms of a collective bargaining agreement. Also, in recognition of the statutory right to strike, no-strike clauses are excluded from the unilateral change doctrine, except to the extent other dispute resolution methods survive expiration of the agreement.
 
 
 109
 Id. 111 S.Ct. at 2221-22 (citations omitted). In upholding the Board's extension of this exception to arbitration provisions, the Court again deferred to the Board's expertise. "The unilateral change doctrine, and the exclusion of arbitration from the scope of that doctrine, represent the Board's interpretation of the NLRA requirement that parties bargain in good faith. And '[i]f the Board adopts a rule that is rational and consistent with the Act ... then the rule is entitled to deference from the courts.' " Id. (quoting Fall River Dyeing and Finishing Corp. v. NLRB, 482 U.S. 27, 42, 107 S.Ct. 2225-2235, 96 L.Ed.2d 22 (1987)).
 
 
 110
 Of course, neither Bonanno nor Litton directly determines the issue in this case. McClatchy was not involved in multiemployer bargaining as in Bonanno, and the Litton exceptions do not provide a rule which can be stretched to this case. As the Court in Litton noted, union security is, by statute, a matter of consent. See 29 U.S.C. § 158(a)(3) (1988) (employer may not discriminate against union nonmembers unless there is an agreement with the union); 29 U.S.C. § 186(c)(4) (1988) (dues check-off does not survive expiration of collective bargaining agreement); 111 S.Ct. at 2221-22. Similarly, the right to strike is protected by statute. 29 U.S.C. § 157 (1988). Here, neither the Newspaper nor the employees have any statutorily guaranteed right to a particular compensation system. The arbitration exception recognized in Litton was founded on the consensual nature of arbitration. The Act, as noted, assumes that economic power will determine the outcome of negotiations between the parties. By contrast, " 'arbitration is, at bottom, a consensual surrender of the economic power which the parties are otherwise free to utilize.' ... '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " Litton, 111 S.Ct. at 2222 (quoting Hilton-Davis Chem. Co., 185 N.L.R.B. 241, 242 (1970); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).
 
 
 111
 Although these exceptions are not dispositive, Bonanno and Litton combine to establish three powerful points. First, the Board's attempted analogy to no-strike clauses in its Colorado-Ute decision will not hold water. See note 6 supra. As the Litton Court noted, the right to strike is protected by statute, whereas the employer merely has a duty to bargain over the wage structure; the NLRA includes no rights to a defined wage structure. As stated above, a proposal for unconstrained discretion necessarily includes all specific merit pay increases. This logical truth exposes the fallacy of the Board's attempt to compare the merit pay proposal to a no-strike clause.
 
 
 112
 Second, although the result reached by the Board in this case finds no adequate justification in the Board's decision, this is not to say that the result cannot be justified. Litton itself suggests that the impasse doctrine is not without exceptions.[9] Thus, the Board may be able to find an exception to deal with the present situation.
 
 
 113
 Third, and most importantly, Bonanno and Litton reiterate the primacy of the Board in resolving the conflicting policies of the NLRA. As noted above, the employer's right to implement a proposal upon impasse grows directly out of the tension between the duty to bargain and the Act's assumption that economic strength may determine the terms of the parties' agreement. Surely it is within the Board's competence to determine in the first instance whether implementing a proposal for unilateral discretion with respect to certain subjects weighs too heavily against the collective bargaining value in the Act.
 
 
 114
 Although a unilateral, discretionary merit pay scheme does not constitute impermissible "direct dealing" per se, thereby making it a permissive subject of bargaining, such a system may pose a substantial threat to the union's role as the employees' representative. Thus, the Court in May Department Stores Co. considered unilateral action on wages to be the equivalent of direct dealing. "Employer action to bring about changes in wage scales without consultation and negotiation with the certified representative of its employees cannot, we think, logically or realistically, be distinguished from bargaining with individuals or minorities." 326 U.S. at 384, 66 S.Ct. at 208. If, after bargaining to impasse over the discretionary proposal, the employer can make unconstrained wage adjustments, the futility of union representation may be driven home to each employee in much the same way the unilateral change doctrine seeks to avoid. Admittedly, the unilateral change doctrine generally presumes that implementing changes post-impasse does not hurt collective bargaining.[10] But if the employer can indefinitely adjust employee wages pursuant to the implemented proposal, impasse will no longer be the "temporary" phenomenon described in Bonanno. Impasses generally will be broken by the application of economic pressure by one side or by changing conditions which alter the economic calculus of one of the sides. See Bonanno Linen Serv., 454 U.S. at 412, 102 S.Ct. at 725; Gulf States Mfg., Inc. v. NLRB, 704 F.2d 1390, 1399 (5th Cir.1983); 1 CHARLES J. MORRIS, THE DEVELOPING LABOR LAW 638 (2d ed. 1983) ("In fact, a legal impasse may end suddenly; almost any changed condition or circumstance will terminate the suspension of the duty to bargain."). Where the employer has the unconstrained authority to adjust wages to respond to changing conditions, it will have substantially smaller incentives to restart collective bargaining.
 
 
 115
 Additionally, when the employer grants individualized merit pay increases, it disturbs the "collectivized" nature of collective bargaining over wages. See J.I. Case Co., 321 U.S. at 339, 64 S.Ct. at 581 (direct dealing impermissible where majority "collectivizes" employment relationship). When the employer presses to impasse a demand for discretion on individual merit payments, it takes a position which pits it against the employees as a group. But when the employer goes the next step and grants merit pay increases to selected individuals, it necessarily divides the employees and "de-collectivizes" the employees' bargaining position with respect to wages. The employees' group decision to utilize each individual's "merit" as a group asset has been nullified. This is very nearly direct dealing. "The fundamental inquiry in a direct dealing case is whether the employer has chosen 'to deal with the Union through the employees, rather than with the employees through the Union.' " NLRB v. Pratt & Whitney Air Craft Div., 789 F.2d 121, 134 (2d Cir.1986) (quoting NLRB v. General Elec. Co., 418 F.2d 736, 759 (2d Cir.1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970)); see also Facet Enters. v. NLRB, 907 F.2d 963, 969 (10th Cir.1990) (same); cf. Inland Tugs v. NLRB, 918 F.2d 1299, 1310 (7th Cir.1990) ("the existence of impasse does not permit an employer to cease recognizing the union as the employees' exclusive representative"); NLRB v. Flex Plastics, Inc., 726 F.2d 272, 275 (6th Cir.1984) (same).
 
 
 116
 The Board must consider whether any of the foregoing or other factors warrant an exception to the impasse rule for discretionary merit pay. McClatchy argues that the Board may not deny it the ability to grant individual wage increases because to do so would deny it an economic weapon in violation of the Insurance Agents' line of cases. See Colorado-Ute, 939 F.2d at 1404 ("[T]he employer may try to achieve the wage terms it desires by using its economic weapon of implementing at impasse. Consistent with the Act, this right exists irrespective of the parties' bargaining positions. To hold otherwise would conflict with the well-established proposition that the NLRB cannot exert its power to dictate the substantive terms of the collective bargaining agreement.") (citations omitted). The right to implement upon impasse, however, does not appear to be an economic weapon akin to a lock-out, which puts all union members in a worse economic position. And even if granting individual wage increases is an "economic weapon," denying the employer the right to implement upon impasse does not mean that the contract necessarily must include definite wage terms. The Board would not exceed its authority as in H.K. Porter by literally writing the terms. The Board, so long as it acts to further the statutory goals, does not exceed its authority by withdrawing a weapon from the employer. See Bonanno Linen Serv., 454 U.S. at 419, 102 S.Ct. at 728 ("[T]he Board in this case has developed a rule which, although it may deny an employer a particular economic weapon, does so in the interest of the proper and pre-eminent goal, maintaining the stability of the multiemployer unit.").
 
 
 117
 If the Board persists on its present course, the most difficult problem that it will face will be to distinguish merit pay from numerous other economic proposals with respect to which an employer may take unilateral action following impasse. At least two members of this panel have some real doubts whether this can be done.[11] In any event, the Board will have an opportunity to test its thinking--which thus far has been quite lacking--when this case is reconsidered on remand.
 
 SILBERMAN, Circuit Judge:
 
 118
 When an employer and a union, after bargaining in good faith, reach an impasse in their negotiations, the employer is generally entitled to implement unilaterally its final proposals on mandatory subjects of bargaining. See NLRB v. Katz, 369 U.S. 736, 745 & n. 12, 82 S.Ct. 1107, 1113 & n. 12, 8 L.Ed.2d 230 (1962); Teamsters Local Union No. 175 v. NLRB, 788 F.2d 27, 30 (D.C.Cir.1986); Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967), review denied sub nom. American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622 (D.C.Cir.1968) (AFTRA ). That is so, the Board explains, because "the employer's duty to bargain over proposed changes does not imply a duty to agree to the union's counterproposals or to make a concession" and "does not give the union a right to veto the proposed changes by withholding consent." Colorado-Ute Elec. Ass'n, 295 N.L.R.B. No. 67 (1989) (citing section 8(d) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(d)), enf. denied, Y939 F.2d 1392 (10th Cir.1991), petition for cert. filed, 60 U.S.L.W. 3582 (U.S. Feb. 25, 1992) (No. 91-1284).
 
 
 119
 In the typical case of post-impasse implementation, the employer institutes a set of wage scales and other fixed conditions of employment that it had previously offered to the union. See, e.g., NLRB v. Pinkston-Hollar Constr. Servs., Inc., 954 F.2d 306 (5th Cir.1992) (specific modifications to employee benefit plans); Emhart Indus. v. NLRB, 907 F.2d 372 (2d Cir.1990) (seniority system); Saunders House v. NLRB, 719 F.2d 683 (3d Cir.1983) (fixed percentage wage increase), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 554 (1984); Newspaper Printing Corp. v. NLRB, 692 F.2d 615 (6th Cir.1982) (changes in work jurisdiction). In other words, the employer's "implementation" of his proposal implies a willingness to define the terms of employment--at least for some period of time. In the case at bar (and in Colorado-Ute ), by contrast, the employer's "proposal"--insofar as it relates to the pay of employees--sets forth no real terms at all; the employer asserts virtually complete and ongoing discretion to pay employees whatever the employer wishes.[1] This demand for almost unlimited management discretion over wages is apparently a new technique of collective bargaining, cf. NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 398, 72 S.Ct. 824, 826, 96 L.Ed. 1027 (1952) (involving proposal for broad management discretion over hiring, discipline, and work schedules), and it is certainly understandable that the union in this case claimed that the company's proposal would turn the union into a "phantom organization."
 
 
 120
 The Board, to be sure, did not hold that the newspaper's proposal was bad faith or "surface bargaining," see, e.g., Cincinnati Newspaper Guild, Local 9 v. NLRB, 938 F.2d 284, 288-89 (D.C.Cir.1991), or that the merit pay proposal was not a mandatory subject of bargaining. See, e.g., Toledo Typographical Union No. 63 v. NLRB, 907 F.2d 1220, 1222-24 (D.C.Cir.1990) (Toledo Blade ). The Board must, after all, keep in mind that it is not authorized to "sit in judgment upon the substantive terms of collective bargaining agreements." American Nat'l Ins. Co., 343 U.S. at 404, 72 S.Ct. at 829. Instead, the Board relied on a new approach it had devised in Colorado-Ute to deal with this emerging technique of employer bargaining--an approach which seems to me to have a certain symmetrical elegance. This approach starts from the Board's implicit view that if an employer and union chose not to have a collective bargaining contract, and the employer had no wage classifications, the employer would have to bargain with the union concerning every change in an individual employee's wages. If the employer, after a bargaining impasse, insists on "implementing" a merit pay proposal which sets no actual norm, but instead gives the employer discretion to pay employees what it wishes, the situation is in essence the same, and the Board will accordingly require the employer to bargain with the union each time it wants to change anyone's pay. See McClatchy Newspapers, 299 N.L.R.B. No. 156, slip op. at 7 (1990). The greater the discretion embodied in the employer's proposal, the more likely, it would appear, the union will have a right to bargain over the specifics of its implementation. The Board reasons that if the employer's proposal gives no real guidance as to who will be paid how much under what circumstances, the union has a statutory right under section 8(a)(5) and 8(d) to bargain over the crystallization of these unknowns.[2] In the Board's view, granting individual wage increases without first bargaining with the union derogates from the statutory right to bargain and may be regarded as a form of impermissible direct dealing between the employer and individual employees. Cf. Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 684-85, 64 S.Ct. 830, 833-34, 88 L.Ed. 1007 (1944).
 
 
 121
 Of course, if the union had agreed to this proposal--as unlikely as that might be--the employer would be entitled to the virtually unlimited discretion that it seeks. Even if the union resists, it is doubtful an employer's insistence on the clause could be thought illegal. American National Insurance holds that an employer's demand for discretion over a particular subject of bargaining does not make that proposal per se unlawful. See American Nat'l Ins. Co., 343 U.S. at 408-09, 72 S.Ct. at 831-32. On the other hand, it is not clear to me (and probably not to the Board either) that an employer's demand for unlimited discretion over all terms and conditions of employment would be statutorily protected. By analyzing this case as one of waiver, the Board has sought to avoid drawing a line between a legally permissible and impermissible amount of discretion.[3] It might be thought that the concept of waiver is analytically distinct from the question whether a dispute is covered by a contract. See Department of the Navy v. FLRA, 962 F.2d 48, 57 (D.C.Cir.1992). Still, in a sense all collective bargaining agreements "waive" or freeze (or channel into contract administration) the parties' bargaining rights covered by the agreement during the term of the agreement. See Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB, 927 F.2d 635, 640-41 (D.C.Cir.1991); Local Union No. 1395, Int'l Bhd of Elec. Workers v. NLRB, 797 F.2d 1027, 1031-32 (D.C.Cir.1986). In a case like this, however, "waiver" carries a more orthodox meaning, because, were the union to agree to the company's proposal, it would accept a vastly diminished role. Cf. Toledo Blade, 907 F.2d at 1222 (an employer who wishes to deal directly with its employees may do so only "if it first obtains the consent of their union.").
 
 
 122
 The Tenth Circuit, reviewing the Board's new theory, rejected it. In Colorado-Ute Electric Association v. NLRB, 939 F.2d 1392 (10th Cir.1991), petition for cert. filed, 60 U.S.L.W. 3582 (U.S. Feb. 25, 1992) (No. 91-1284), the Tenth Circuit held that the Board's policy was inconsistent with the NLRA, because the Act "contemplates the legality of broad management-rights clauses and the protection of the right to bargain [only] through the application of good-faith bargaining standards." Id. at 1405. Judge Edwards, although he disagrees with the Tenth Circuit that the Board's result is legally unsupportable, is similarly skeptical of what he calls the Board's "waiver rationale." Opinion of Judge Edwards at 48. He says that "[e]stablished waiver doctrine," id. at 46, is inapposite to the problem of post-impasse implementation of management discretion clauses. This may be so, but it is not decisive. The real question is whether the Board has authority to fashion its new and somewhat different waiver rationale to address this problem.
 
 
 123
 In my view, the answer is not obvious. The language of the National Labor Relations Act--particularly sections 8(a)(5) and 8(d) setting forth the employer's obligation to bargain collectively--may well be sufficiently general to permit the Board to ground an acceptable rationale on the statute's terms. See Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). Certainly the Act is entirely silent on the question of an employer's right to implement proposals unilaterally after impasse, which is the only concept the Board's new theory would alter. Apart from Colorado-Ute itself, I am aware of no case holding that the Act requires that an employer be allowed to implement unilaterally after impasse a proposal giving it substantial discretion over the pay of individual employees.[4] And on several occasions, the Supreme Court has been willing to uphold curtailments of employer discretion that are designed to preserve the integrity of the collective bargaining relationship or the union's statutory right to engage in concerted activity. See Charles D. Bonanno Linen Serv. v. NLRB, 454 U.S. 404, 412, 418-19, 102 S.Ct. 720, 725, 728-29, 70 L.Ed.2d 656 (1982); NLRB v. Erie Resistor Corp., 373 U.S. 221, 233-35, 83 S.Ct. 1139, 1148-49, 10 L.Ed.2d 308 (1963); cf. NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1189 (D.C.Cir.1981) (holding that an employer cannot grant discretionary pay increases prior to impasse without bargaining with the union over their size); NLRB v. John Zink Co., 551 F.2d 799, 802 (10th Cir.1977) (same).
 
 
 124
 Although the Supreme Court has held that conventional merit pay proposals are mandatory subjects of bargaining, see Katz, 369 U.S. at 745, 82 S.Ct. at 1112, and suggested that they would not derogate from the rights of the union solely because of the management discretion they entail, see American Nat'l Ins. Co., 343 U.S. at 408-09, 72 S.Ct. at 831-32, the Court has never focused on the implementation of merit pay plans after impasse--let alone a plan such as this one. Indeed, in Litton Financial Printing Division v. NLRB, --- U.S. ----, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), the Court recognized that certain types of proposals--in Litton it was an arbitration clause--are contract-dependent and may not be imposed absent consent. See id. at 2222. This necessarily means that such provisions are outside not only the ban on pre-impasse unilateral changes at issue in Litton, but also the privilege of unilateral implementation after impasse.
 
 
 125
 As we have observed, other contract-dependent provisions, such as union-shop, dues-checkoff, and no-strike provisions, all either involve a "statutorily guaranteed right" or are "statutorily dependent upon an existing collective bargaining agreement." Southwestern Steel & Supply Inc. v. NLRB, 806 F.2d 1111, 1114 (D.C.Cir.1986). It seems to me that a good argument can be made that discretionary merit pay plans of the sort we have here undermine the statutory right of a union to bargain collectively over wages, and thus fall within the rationale of cases like Litton.[5] Even Katz, which held that an employer could not grant discretionary merit pay increases to selected employees during negotiations for an initial contract, does not rule out the argument that discretionary merit pay schemes are contract-dependent.
 
 
 126
 The real problem in this case is that the Board has not adequately explained its position. In its order, the Board did not discuss Litton, Katz, or Southwestern. It made no effort to reconcile its novel theory that certain proposals involving mandatory subjects of bargaining may not be implemented after impasse with the arguably contrary strains in the law that led the Tenth Circuit to disapprove the theory in Colorado-Ute. It gave no indication of the way in which its policy would work in practice or what types of management discretion would be included within the policy's boundaries. We have no way of knowing, for example, whether employers would be barred from implementing after impasse all clauses reserving some discretion to management, including those pertaining to non-wage terms of employment or traditional management rights, or whether the Board's policy would instead be limited to contract terms that are deemed to be in some sense at the core of the collective bargaining right. Nor did the Board satisfy its obligation to address its own contrary precedents approving unilateral post-impasse implementation of merit pay plans, so that the court and the public could be certain that the Board charted its new course deliberately. See, e.g., Hyatt Hotels Corp., 296 N.L.R.B. No. 37 (1989), enf'd on other grounds, 939 F.2d 361 (6th Cir.1991); Presto Casting Co., 262 N.L.R.B. 346, 354-55 (1982), enf'd in part and enf. denied in part on other grounds, 708 F.2d 495 (9th Cir.), cert. denied, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983).
 
 
 127
 Instead, the Board's order said only that McClatchy's merit pay proposal, "by providing for unlimited management discretion over the determination of timing and amounts of merit increases, was in reality seeking the Union's waiver of its statutory right to be consulted over those matters" and concluded, relying on its prior determination in Colorado-Ute, that unilateral implementation was impermissible, because McClatchy "still had a duty to bargain with the Union about the timing and amounts of the merit increases prior to granting any such increases." McClatchy Newspapers, Inc., 299 N.L.R.B. No. 156, slip op. at 6, 7 (1990). This explanation is inadequate to support such a major change in the law, especially one that is in some tension with other important doctrines. The Board's policy, in order to be entitled to judicial deference, must be explained and justified further. Accordingly, I agree that this case is appropriately remanded to the NLRB for further consideration.
 
 
 128
 KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 129
 I agree with Judge Silberman's characterization of the Board's rationale as "inadequate to support such a major change in the law," Silberman Opinion at 1178, and even more with Judge Edwards' determination that the Board's order "rests on a completely inadequate theory and fails to recognize the settled legal doctrines which bound this case," Edwards Opinion at 1154. I therefore join my colleagues in denying the petition for enforcement. Nevertheless I dissent from their decision to remand. In my view, it follows ineluctably from the "settled legal doctrines" Judge Edwards invokes that the Board's merit pay decision "infringes on the employer's right to bargain for and implement an admittedly lawful wage proposal." Colorado-Ute Elec. Ass'n, Inc. v. NLRB, 939 F.2d 1392, 1405 (10th Cir.1991). Accordingly, I would simply deny enforcement of the Board's order.
 
 
 130
 It is beyond dispute that an employer commits an unfair labor practice if it unilaterally changes a mandatory subject of bargaining without first bargaining to impasse. Litton Fin. Printing Div. v. NLRB, --- U.S. ----, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991). It is equally settled, however, that if the employer first bargains in good faith to impasse it may proceed to implement its proposed change, notwithstanding the union's ultimate failure to consent. Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB, 927 F.2d 635, 642 (D.C.Cir.1991). That is exactly what occurred here. McClatchy proposed to institute a discretionary merit raise system, a proposal subject to mandatory bargaining. See NLRB v. Katz, 369 U.S. 736, 745-46, 82 S.Ct. 1107, 1112-13, 8 L.Ed.2d 230 (1962). The Union opposed McClatchy's proposal and, as the Board expressly found, the parties reached a bargaining impasse after "engag[ing] in indepth, good faith negotiations." JA 314. After impasse McClatchy was entitled under established law to implement its proposal and to grant merit increases. Thus, in attempting to prevent implementation, the Board impermissibly "exert[ed] its power to dictate the substantive terms of the collective bargaining agreement." Colorado-Ute, 939 F.2d at 1404 (citing H.K. Porter Co., Inc. v. NLRB, 397 U.S. 99, 103-04, 90 S.Ct. 821, 823-24, 25 L.Ed.2d 146 (1970); NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 401-02, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952); and NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 488, 80 S.Ct. 419, 426, 4 L.Ed.2d 454 (1960)). That the implementation here involved exercise of employer discretion should not subject McClatchy to any additional bargaining obligation. It is precisely this discretionary aspect of the proposal that stalled negotiation and led to impasse.
 
 
 131
 Given the clear precedent supporting the lawfulness of McClatchy's conduct, I find it more than merely "difficult to comprehend the Board's judgment in this case," as did Judge Edwards, Edwards Opinion at 45, I find it impossible. For this reason, I would refuse to enforce the Board's unsupported (and unsupportable) decision and, I hope, lay this issue to rest. "There is no necessity to treat the case like a yo-yo," Murray v. Buchanan, 720 F.2d 689, 693 n. 6 (D.C.Cir.1983) (en banc) (MacKinnon, J., concurring specially), vainly remanding for the Board to concoct a different but equally unavailing rationale. Further, even were remand appropriate, I see no justification for this court to serve up for the Board "a smorgasbord of possible explanations of what the Board has done." Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of N.Y. & Vicinity v. NLRB, 521 F.2d 885, 891 n. 9 (D.C.Cir.1975). Notwithstanding the erudition evident in my colleagues' opinions, I suggest that the Board's decision and supporting rationale should spring from its own specialized expertise which, after all, accounts in large part for the deference we accord its decisions. See International Bhd. of Elec. Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 719 (D.C.Cir.1987) ("[T]he very logic for deference to agency decisionmaking ... is to place policy choices (within the limits permitted by statute) in the hands of delegated agents of Congress, subject to their expertise and experience.") (citation and emphasis omitted).
 
 
 
 [1]
 The merit pay program could not be used to decrease wages
 
 
 [2]
 Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the right[ ]" to organize and act collectively. 29 U.S.C. § 158(a)(1) (1988); see also 29 U.S.C. § 157 (1988) (employees' rights to organize and to act collectively)
 
 
 [3]
 In Toledo Blade, the court distinguished between a provision which would have allowed the employer to deal directly with individual employees over retirement benefits (held to be permissive) and the management rights proposal upheld in American National Insurance, noting that in the latter case "[t]he employer's subsequent decisions would be made unilaterally; they would not entail its negotiating with its employees." 907 F.2d at 1223-24
 
 
 [4]
 As noted infra, the Board's finding in this case is not in conformity with the Katz line of authority; that is so because, in this case, the employer was found to have bargained in good faith to a point of impasse, and the disputed unilateral action was taken only after impasse (and not during the course of negotiations)
 
 
 [5]
 See also Teamsters Local Union No. 639 v. NLRB, 924 F.2d 1078, 1083 (D.C.Cir.1991) ("In reviewing the Board's determination of impasse, we are mindful of its accumulated expertise in the area: 'in the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with the such problems.' ") (quoting Dallas Gen. Drivers Local Union No. 745 v. NLRB, 355 F.2d 842, 844-45 (D.C.Cir.1966)); Peter G. Earle, Note, The Impasse Doctrine, 64 CHI.-KENT L.REV. 407 (1988) (reviewing factors considered in impasse cases)
 
 
 [6]
 In Colorado-Ute, the Board illustrated its argument with the following hypothetical:
 Consider, as a typical example, a case where an employer proposes in negotiations for a new contract that wages should be reduced from $7 an hour to $6 an hour. The union proposes that wages be increased to $8 an hour. The parties insist on their respective positions until they reach a good-faith impasse in negotiations. Having reached a point where further bargaining would be fruitless, Section 8(a)(5) does not require the employer thereafter to pay its employees $8 an hour as the union demanded, or to abandon its proposal and leave wages at $7 an hour. The employer is free to implement its proposal and pay employees $6 an hour.
 In the example above, the employees have no statutory right to be paid $8.00 or $7.00 an hour rather than $6.00 an hour, thus the Act does not require that the employer obtain the union's consent before paying $6.00 an hour. The Act only requires that the employer propose the wage rate and bargain with the union in good faith before implementation. Where an employer proposal seeks the union's waiver of statutory rights, however, impasse is no substitute for consent. An employer may insist to impasse as a condition of agreement that the union agree to a no-strike clause. Shell Oil Co., 77 N.L.R.B. 1306 (1948). Absent the union's agreement, however, the employer is not thereafter free to implement its proposal by firing striking employees.
 
 
 [295]
 N.L.R.B. No. 67, at 9
 The Board's argument premised on the no-strike example is a non sequitur. Under the National Labor Relations Act, employees have an absolute statutory right to strike, absent some contractual waiver of that right. There is no comparable statutory right to be paid pursuant to a "fixed-rate" as opposed to a "merit" pay system. The Board's no-strike example is further flawed on its own terms: although an employer may not unilaterally impose a no-strike commitment, an employer may act unilaterally to hire permanent replacements for employees who engage in economic strikes.
 
 
 [7]
 In Cincinnati Newspaper Guild, where the court found no direct dealing, it appears the union had the right to represent the employees in all appeals. See 938 F.2d at 290; see also Colorado-Ute, 939 F.2d at 1397-98 n. 3 (noting that employee discussions with company president regarding their individual merit raises might constitute "negotiations," but finding no individual discussions in that case)
 
 
 [8]
 The Board, at this point, may not be able to rely on this theory here, if the Guild waived it or the General Counsel failed to argue it. In this court, the Guild did not advance it, relying instead as it must on the Board's erroneous waiver theory. See Brief for Intervenor, Northern California Newspaper Guild, Local 52, at 15 n. 6 ("Toledo Blade held that for all these reasons, a proposal for direct dealing between an employer and employees is not a mandatory subject of bargaining at all. For purposes of this case, the union is not so contending, but is maintaining, instead, that at the very least the direct dealing aspects of the merit pay program here underscore that that proposal involves a substantial waiver of statutory rights.") (citation omitted)
 
 
 [9]
 Although the Seventh Circuit may be right that Litton does not settle the issue whether a union may compel an employer to arbitrate a dispute arising under a proposal the employer unilaterally implemented following impasse, where the final proposal contains an arbitration provision, see Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 935 F.2d 1501, 1510-11 (7th Cir.1991), Litton surely means that an implementing employer could not compel a union to arbitrate by including such a provision in its final offer. Litton holds that arbitration is a matter of consent, and, while an employer who implements a final proposal containing arbitration might be said to consent to it, the union over whose objection the proposal is implemented cannot be said to have given its consent
 
 
 [10]
 See NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 224-25, 69 S.Ct. 960, 963-64, 93 L.Ed. 1320 (1949) ("We do not here have a unilateral grant of an increase in pay made by an employer after the same proposal has been made by the employer in the course of collective bargaining but has been left unaccepted or even rejected in those negotiations. Such a grant might well carry no disparagement of the collective bargaining proceedings. Instead of being regarded as an unfair labor practice, it might be welcomed by the bargaining representative, without prejudice to the rest of the negotiations.")
 
 
 [11]
 Judge Silberman's separate opinion seems to suggest that, in order to reach its preferred result in this case, the Board could limit the definition of "wages" under section 8(d) to cover only specific (i.e., nondiscretionary) wage proposals. As I understand it, under Judge Silberman's approach, an employer would not satisfy the duty to bargain over "wages" absent good faith negotiations over a definite (or standard-based) wage proposal. The problem with this proposal is that it is clearly foreclosed by NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). The Supreme Court in American National Insurance Co. held that the obligation to bargain over wages does not require an employer to offer a standard-based proposal. On this point, the Court said,
 [i]gnoring the nature of the Union's demand in this case, the Board takes the position that employers subject to the Act must agree to include in any labor agreement provisions establishing fixed standards for work schedules or any other condition of employment.... Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board.... Any fears the Board may entertain that use of management functions clauses will lead to evasion of an employer's duty to bargain collectively as to "rates of pay, wages, hours and conditions of employment" do not justify condemning all bargaining for management functions clauses covering any "condition of employment" as per se violations of the Act.
 343 U.S. at 408-09, 72 S.Ct. at 831-32.
 For the past forty years, the labor law jurisprudence of this country has been absolutely clear in indicating that the NLRA does not require an employer to offer to the union (or to an individual employee through the union) definite wage terms. See also Cincinnati Newspaper Guild, Local 9 v. NLRB, 938 F.2d 284, 289 (D.C.Cir.1991) (Board cannot find that employer bargained in bad faith over "wages" when it insists on merit pay system.). Indeed, this has been an inviolate principle under the Act, so I cannot imagine how the Board could write it out of existence pursuant to Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), as Judge Silberman's separate opinion appears to propose. Thus, unless Congress revises the Act, or the Supreme Court overturns the judgment in American National Insurance Co., I do not see how the Board can reach the position espoused by Judge Silberman.
 In my view, given that, based on American National Insurance Co., the employer has the right not to agree to a standard-based scheme for employee wages, the question becomes what action the employer can take after fulfilling the duty to bargain and exercising the right not to agree. In general, the impasse-doctrine suggests that the employer is free to act--the NLRA no longer acts as a constraint. Nonetheless, as I have suggested, the concern over "direct dealing" still limits an employer and this may provide a theoretical base upon which the Board could rest to develop restrictions on unilateral action taken after impasse.
 
 
 [1]
 In this case, McClatchy's final offer proposed that all salary increases would be the result of discretionary merit reviews of individual employee performance. Although the proposal bore a surface similarity to traditional merit pay plans, which permit the employer to grant merit increases on top of normal wage scales, see, e.g., Katz, 369 U.S. at 745-46, 82 S.Ct. at 1112-13, in reality it was quite different: it proposed to use as a salary floor the minimum salaries established in the several-year-old, expired contract. Because of inflation and because ninety percent of McClatchy's employees were already receiving the maximum salaries under the expired contract, these floors were of no real significance
 
 
 [2]
 It is true, as Judge Edwards notes, see Opinion of Judge Edwards at 1166-67, that we have previously stated that an employer who has bargained to impasse may make a unilateral change without being under "a duty to bargain about timing or other specific aspects of a change that is within the ambit of proposals already made and rejected." AFTRA, 395 F.2d at 629. But this proposition loses its meaning when a proposal has no identifiable "ambit." AFTRA involved fairly specific proposals for changes in work assignment procedures and prerecording policies, which left the employer free to act in only a narrow sphere of its operations. At some point, a proposal seeking discretion becomes so amorphous that almost nothing the employer does after impasse can be challenged, because the Board will be unable to determine whether or not any specific action falls outside the proposal. Deciding how sharply focused and finely tuned the lines must be in various areas of bargaining before a proposal may be implemented unilaterally after impasse is a tricky, policy-laden business, but, as I explain below, it is a business the Act may well empower the Board to get into
 
 
 [3]
 Determining when an employer's proposal retains so much discretion that a post-impasse "implementation" is so indefinite that further bargaining at the point of specific application is required also involves line drawing. But there is presumably less tension inherent in that analytic process than there would be if the question were whether or not a proposal is entirely illegal
 
 
 [4]
 American National Insurance, which dealt with a classic management rights clause rather than what might be thought the more sensitive issue of wages, does not even address the problem of "implementing" a discretionary provision post-impasse
 
 
 [5]
 There are also potential problems with this reasoning, depending upon the precise nature of the Board's theory. If, for example, the Board concludes (as perhaps it must) that an employer may implement unilaterally an individual merit pay increase after bargaining to impasse with the union over it, then merit pay would not be contract-dependent in the strict Litton sense